**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TALLAVETTE MUELLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 C 7080** |
| **v.** | ) | |
| | ) | **Magistrate Judge Cole** |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Tallavette Mueller, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2). Ms. Mueller asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**INTRODUCTION: A NOTE ON THE "LOGICAL BRIDGE" REQUIREMENT**

In Social Security cases, it has become *de rigeur* to seek a reversal of an ALJ's decision on the ground that the ALJ failed to build "a logical bridge" between the evidence and the conclusion. Ms. Mueller's brief is no exception. As occurs with so many catch phrases, the phrase, "logical bridge" has taken on a life of its own as though it were some self-defining, and highly exacting test. But, as Justice Holmes warned, courts must be wary of the uncritical and indiscriminate use of labels and catch phrases: "It is not the first use but the tiresome repetition of inadequate catch words upon which I am observing – phrases which originally were contributions, but which, by their very felicity delay further analysis. . . ." Holmes, *Law and Science and Science and Law*, 12 Harv.L.Rev. 443, 455 (1899). *See also Lorenzo v. Wirth*, 170

Mass. 596, 600, 49 N.E. 1010 (1898) (Holmes, J.)("Too broadly generalized conceptions are a constant source of fallacy"). Indeed, Judge Posner, who coined the phrase in *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996), would be the first to recognize that it was not meant as a self-defining test. *Compare United States v. McGuire*, 627 F.3d 622, 625 (7th Cir. 2010)("later cases, ignoring Justice Holmes's admonition to think things not words...."). *See also Meridian Security Insurance Co. v. Sadowski*, 441 F.3d 536 (7th Cir. 2006)(Easterbrook, J.)("The phrase [reasonable probability] acquired a life of its own"; "the turn of the phrase was infelicitous.").

The rather simple point Judge Posner sought to make was that conclusions by Administrative Law Judges, no less than by federal judges, are not persuasive and preclude meaningful appellate review. There must be an explanation of how the ALJ derived his conclusions from the evidence. But there is no particular format to be followed and no formula to determine the adequacy of the explanation, which is never a function of aesthetics. The ALJ need not build the Pont Neuf. A simple trestle may suffice so long as it takes the reviewing judge from point A to point B. The ALJ's explanations in this case were more than adequate.

## I.
## PROCEDURAL HISTORY

Ms. Mueller applied for DIB on October 25, 2007, alleging she had been disabled since January 1, 2007, due to discogenic and degenerative disorders of her back and a secondary diagnosis of asthma (Administrative Record ("R.") 51). Her application was denied initially on February 20, 2008, and upon reconsideration on June 30, 2008. (R. 81-84, 89-91). Ms. Mueller filed a timely request for hearing in pursuit of her claim on August 1, 2008. (R. 93). The administrative law judge ("ALJ") convened a hearing on November 10, 2009, at which Ms. Mueller, represented by counsel, appeared and testified. (R. 14-50). In addition, Mr. Dunlevy

testified as a vocational expert. (R.34-42, 46-49). At the hearing, Ms. Mueller amended her alleged onset date from January 1, 2007 to May 1, 2007. (R. 164; *see also,* R. 17, 20). On December 7, 2009, the ALJ issued an unfavorable decision, denying Ms. Mueller's application for DIB even though she was unable to perform past relevant work, because despite her limitations jobs existed in significant numbers in the economy that she could still perform. (R. 58-65). The ALJ's decision became the Commissioner's final decision on October 12, 2010, when the Appeals Council denied Ms. Mueller's request for review. (R. 1-3). *See* 20 C.F.R. §§404.955; 404.981. Ms. Mueller appealed that decision to the federal district court under 42 U.S.C. §405(g), and both parties consented to jurisdiction of a magistrate judge pursuant to 28 U.S.C. §636(c).

## II.
## THE RECORD EVIDENCE

### A.
### The Vocational Evidence

Ms. Mueller was born on November 7, 1961, making her forty-eight years old at the time of the ALJ's decision. (R. 19). She is married with two adult children. She is approximately 5' 4", and at the time of the hearing, weighed two hundred and sixty pounds. (R. 26). She has had some college – two years – and technical training, becoming a Certified Nursing Assistant in 1982. (R. 19, 186). From 1995 to 1997, Ms. Mueller worked as a nursing assistant in private duty and at a nursing home, until she suffered a hernia. (R. 24, 37-38, 181). From 1999, until she was fired in 2003, Ms. Mueller worked as a training specialist, at a facility for physically and mentally disabled adults (R. 23, 38, 181). From 2005, through her amended onset date of May 1, 2007, she was employed with a courier service as a delivery driver. (R. 21-23, 167, 181). She did

not work again until several months later when, in November 2007, she was paid to care for her ailing father as a home health assistant. (R. 20). When he died, she took on a similar role caring for her mother. (R. 20). At the time of the hearing, she was still working in that capacity, approximately fifteen hours a week, making $9.35/hr. (R. 20-21).

## B.
## The Medical Evidence

Ms. Mueller first visited Roya Family Medical Center ("Roya") on September 30, 2005, complaining of stomach pain, loose stool, and pain in her back. (R. 277). At the time she was taking hydrochlorothiazide ("HCTZ") for her blood pressure, and using an albuterol (Proventil) inhaler for her asthma. (R. 277). She reported a past medical history of a hernia, hypertension, and asthma. (R. 277). A blood draw revealed elevated cholesterol, (R. 280, 278-279), and on October 7, 2005, Ms. Mueller returned to discuss how to lower it through diet. (R. 284).

On January 6, 2006, Ms. Mueller was seen in the Westlake Hospital emergency department complaining of headaches, followed by numbness and tingling in her left extremities, and chest pain. (R. 468, 470, 471). To rule out a stroke, a battery of tests were ordered. (R. 474-484). All were normal except the lipid panel, which indicated high cholesterol. Dr. McCoyd concluded she might have had a transient ischemic attack, but that her symptoms had largely resolved. (R. 471-472). He recommended a CT scan of her brain to rule out stenosis or emboli and treatment with low dose aspirin, or if it wasn't tolerated, Plavix. (R. 473, 479). He noted her general status and weight had been stable, but she was "rather" obese. (R. 471). He indicated, that she had "no difficulty walking." (R.471). Ms. Mueller was discharged the following day with *no* activity restrictions except "as tolerated." (R. 470, 487).

On August 18, 2006, Ms. Mueller went to the Stroger Hospital emergency department

complaining of chest tightness and shortness of breath claiming she was having an asthma attack. (R. 268). Various tests were run, all normal. (R. 268). Dr. Siddique reported the rest of her review of systems ("ROS") was normal and her legs showed *no edema*. (R. 268). She was treated and discharged two days later. (R. 268, 269).

On December 13, 2006, Ms. Mueller returned to Roya complaining of headaches, dizziness and nausea having forgotten to take her blood pressure medication. (R. 281). Roya staff called 911 and she was taken to the emergency department at Westlake Hospital. Triage and a subsequent physical examination noted *no pain* or tenderness in her musculoskeletal system. (R. 442, 454). Ms. Mueller was diagnosed with a headache and instructed to take Tylenol, her meds as prescribed, and follow up with her doctor. (R. 452).

On August 21, 2007, Ms. Mueller came into Roya asking for a TB test "for her job" and medication refills. (R. 276). Additionally, contained within the records from Roya, is an undated second page of a report that lists a diagnosis for GERD and chronic back pain, with a treatment recommendation of Zantac, Motrin, and a stomatitis cocktail, along with an increase in fluid intake and avoidance of milk products and greasy, fried, or spicy foods. (R.361).

On October 12, 2007, Ms. Mueller saw Dr. Giacchino at the Melrose Park Clinic for the first time. She complained of pain in her lower back and thighs and self-reported a history of a herniated disk. (R. 345). Dr. Giacchino noted *no edema* in her extremities and free range of motion. (R. 329). He gave her a prescription for Feldene and a refill for HCTZ. (R. 345). Ms. Mueller returned to the clinic on October 24, 2007, where it was noted, "[patient] claims she is applying for "Disability" and needs MRI's of back and hips." (R. 344). Ms. Mueller complained of pain in her hip joints and lower back, claiming the pain was a seven out of ten daily. (R. 344).

Dr. Giacchino prescribed Vicodin and ordered an MRI of her hips and lumbar spine. (R. 344).[1]

On October 25, 2007, Ms. Mueller had an MRI of her lumbar spine at Midwest Open MRI which showed *minimal* bulging of the L4-5 and L5-S1 disks, *moderate* spinal stenosis at L4-5 and, to a lesser degree ("borderline"), at L3-4*,* and degenerative changes of the facets, primarily at L4-5 and, to a lesser degree ("minimal"), at L5-S1. (R. 343). The next day, Ms. Mueller had an MRI of her hips which showed *minimal* degenerative changes and no evidence for aseptic necrosis of the femoral heads. (R. 342).

Ms. Mueller saw Dr. Giacchino on November 7, 2007, to review her MRI results. On November 30, 2007, Ms. Mueller returned and self-assessed her pain for the previous week as a 2 out of 10 and, a 4 at its worst. (R. 336). She indicated that Vicodin reduced her pain by 80 percent and that the amount of pain relief it provided was enough "to make a real difference in [her] life." It was noted her pain relief was clinically significant. On December 12, 2007, Ms. Mueller self-assessed her pain for the previous week this time as a 3 out of 10. (R. 335). Again, she indicated an 80 percent relief in pain from the Vicodin and a clinically significant relief in pain was noted.

On December 8, 2007, Ms. Mueller went to Loyola University Medical Center for epigastric pain after eating cake. (R. 337, 415). A subsequent ultrasound on January 14, 2008, revealed a large gallstone, (R. 365), however no further action was taken until August 18, 2008. *See infra.*

The Agency arranged for Ms. Mueller to undergo a Consultative Examination ("CE") on January 21, 2008, with Dr. Villanueva. (R. 315-21). Dr. Villanueva reviewed all the information sent by DDS and records provided by Ms. Mueller, which included her MRI results*.* (R. 316,

---

[1] From a review of the record, this appears to be the first instance of Ms. Mueller being prescribed a narcotic like hydrocodone for her back pain.

317). Ms. Mueller related that she was hit by a car in 1979 when she was 17 years old. She was x-rayed at the ER and no fractures were found. (R. 316). She claimed that in 1987, she began experiencing aching pain in her lower back, which radiated down into her buttocks and sometimes, into her legs which worsened when it was cold and raining. (R. 316).

Ms. Mueller stated the pain was now *constant*. (R. 316). Walking three blocks or climbing one flight of stairs would exacerbate the pain, but she *denied* ever experiencing numbness or a tingling sensation. (R. 316). Dr. Villanueva noted that Ms. Mueller's gait was slow, but that *she did not use an assistive device.* (R. 317, 318). She was unable to perform a heel or toe walk or squat, reporting back pain, (R. 317), but only had "mild" difficulty getting on and off the exam table. (R. 318). Her strait leg raise was positive on the right. (R. 317). She had no difficulty in making a fist, her grip was 5/5 bilaterally, and her fine dexterity was normal bilaterally. (R. 317). Ms. Mueller also reported tenderness her lower back with lumbar spine flexion to 50 degrees, extension to 20 degrees, left lateral bending 15 degrees, right lateral bending to 15 degrees. (R. 317). Dr. Villanueva's overall clinical impression was that Mrs. Mueller *possibly* had arthritis in her lumbar area. (R. 317).

Also at the request of the Agency, Dr. Patey completed a Physical Residual Functional Capacity Assessment ("PRFCA") on February 8, 2008, reviewing all of the medical records submitted by Ms. Mueller in support of her application for DIB including her MRIs and Dr. Villanueva's CE (R. 322-29). Dr. Patey assessed that Ms. Mueller could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight hour work day, sit about six hours in an eight hour work day, and push or pull with no limitations. (R. 323). He also assessed that she should have the postural limitations of only occasional stooping, kneeling, crouching, crawling, and climbing ramps, stairs, ladders, ropes, or

7

scaffolds. (R. 324). He noted a decreased ROM of the lumbar spine with slow gait. (R. 324). Since none were alleged or indicated, he did not establish any manipulative, visual, communicative, or environmental limitations. (R. 325-26).

Dr. Patey noted there were no treating or examining source statements regarding Ms. Mueller's physical capacities in the file – other than the CE which he refers to in his comments. (R. 328). He concluded that her activities of daily living were consistent with her back limitations and diagnosis but, that some limitations were "excessive when compared to objective findings." (R. 329).

On June 6, 2008, Dr. Gotanco, was asked to review and reconsider Dr. Patey's RFC assessment. (R. 398-400). He reviewed updated medical records including a more recent pain self-assessment and the ultrasound of Ms. Mueller's gallbladder. Dr. Gotanco noted the fact that Ms. Mueller self-assessed her weekly pain as a three out of ten and reported eighty-percent of her pain was reduced by medication. (R. 400, 333). He affirmed Dr. Patey's RFC assessment noting that, "No other abnormal findings or significant changes noted." (R. 399, 400).

On August 7, 2008, Ms. Mueller went to the Fantus Health Center ("Fantus") for a hypertension med refill and low back pain where the triage nurse noted she was using a walker. (R. 420, 422).[2]  Dr. Kudaravalli noted she was obese. Ms. Mueller reported a disk prolapse but had not brought the MRI report. (R. 420). She indicated she *did not have pain in her legs* and that she was able to walk with a walker. (R. 420). He prescribed her Tylenol for pain and referred to her to Stroger's Neurosurgery clinic, asking for her to be evaluated based on her claims of low back pain and weakness of legs. (R. 418).

---

[2] Chronologically, this appears to be the first instance in the record that mentions Ms. Mueller's use of a walker.

On August 18, 2008, Ms. Mueller went to Stroger Hospital's outpatient clinic. Ms. Mueller reported a history of asthma – her last hospitalization in 2006, hypertension, high cholesterol, and obesity. (R. 415). She claimed to have "spine and bilateral [degenerative join disease] after [Motor Vehicle Collision] 1970s requiring walker." (R. 415). Dr. Bertelson noted her obesity and *mild* non-pitting edema in her lower extremities. (R. 415). Dr. Bertelson diagnosed her with symptomatic cholelithiasis with possible GERD and referred her for a surgical consult. (R. 415).

In the record, there are two documents stamped with the designation "SSC Neurosurgery." (R. 419, 420). The first is a copy of the aforementioned referral from Dr. Kudaravalli on August 7th, the second, is a handwritten progress note dated September 12, 2008, which reads, "Progressive difficulty walking since 2007 – patient has L4-5 stenosis –Recommend L4-5 laminectomy." (R. 419). The note is signed, but the signature is illegible. There are no other records from Stroger's Neurosurgery clinic in the medical record.

On October 8, 2008, Dr. Harrison performed a pre-op evaluation for gallbladder surgery. Ms. Mueller reported a past history of low back pain secondary to lumbosacral disc disease and indicated her back pain was the primary impediment to her activities of daily living. (R. 412). However, Ms. Mueller also indicated "unlimited exercise tolerance with a walker" and reported "walking greater than 1 mile with frequency." (R. 412). She *denied* having chest pains, dyspnea on exertion or shortness of breath, heart palpitations, pre-loss of consciousness or loss of consciousness, PND, orthopena, cough, or pedal edema. She also *denied* using her inhaler regularly, and indicated her *last* episode of asthma was more than three-years prior. (R. 412). Dr. Harrison listed the medications she was currently taking: HCZT, KCL, Nifedipine, Proventil,

and Rantidine.[3] He also noted no recent aspirin or NSAID use and that her effort tolerance and pertinent review of systems was "Fair." (R. 413). Dr. Harrison concluded she was at low risk for the procedure and met exercise tolerance. (R. 413).

On October 10, 2008, Dr. Richter performed a laparoscopic cholecystectomy removing Ms. Mueller's gallbladder without complications. (R. 408, 410). On October 23, 2008, in a progress note, Dr. Schaeffer noted Ms. Mueller was doing well, and that she could return to work and normal activities. (R. 405).

On December 12, 2008, Ms. Mueller went to Stroger Hospital's emergency department complaining of burning urination and ankle pain. (R. 402-403). She indicated she had hurt her left ankle while *jumping*, but that she had since been bearing weight (R. 403). She also indicated she was using a walker regularly for back pain. (R. 403). She was given Motrin for her sprained ankle and the antibiotic Cipro for her UTI. (R. 403).

On May 14, 2009, Ms. Mueller returned to Fantus for a refill of her medication and for education on nutritional-label reading. Although Ms. Mueller reported a herniated disc, the Triage Assessment is blank with respect to her pain scale, nor does her listed medications include any for pain. (R. 435). A nurse reviewed meal planning and correct portion sizes with Ms. Mueller and encouraged healthy eating and grocery shopping. (R. 436).

On June 30, 2009, Ms. Mueller visited Austin Health Center ("Austin"), for a checkup and lower back pain, claiming an eight out of ten on the pain scale (R. 427-431). She related that she was in the Neurosurgery clinic for a herniated disc, (R. 429), but the only pain medication she listed was Tylenol. (R. 430). There is no indication of any treatment for her lower back other than a mention of diet and exercise. (R. 428).

---

[3] It's interesting to note, that none of these medications are for treatment of pain or inflammation.

On November 10, 2009, the date of the hearing, Ms. Mueller faxed an update packet. (R. 17, 253-254). In the packet, Ms. Mueller indicated seeing a Dr. George R. Cybulski in September and October 2008. She wrote that he "recommended surgery to take the disc off the nerve to be able to stand straight." She continued, "I called his office, they put me on the waiting list." Ms. Mueller also listed Dr. Abel Kho who "suggested I loose [sic] weight before trying surgery so he put me on anti-inflammatory medication so I would have less pain so I could exercise." Finally, Ms. Mueller listed Dr. Wasay-A-Gm Ahmed who is "monitoring my blood pressure, and asthma." But "has not recommended any treatment for my back." There are no records from any of these physicians in the administrative record.[4]

## C.
## The Administrative Hearing Testimony

At the administrative hearing, Ms. Mueller's attorney argued that Ms. Mueller was disabled due to spinal stenosis and arthritis of both hips. (R. 18). She indicated that Ms. Mueller alternated between using a cane and walker depending on how much walking she had to do and that she has been ambulating with a walker *since at least 2008*. (R. 18). She argued that given Ms. Mueller's use of a walker and/or cane, she would be limited to sedentary work, and even then, she would be unable to maintain gainful employment because of her use of a walker and an inability to focus, concentrate and stay on task resulting from her physical pain. (R. 18-19). Her attorney admitted the physical exams do not show the severity of Ms. Mueller's alleged condition but argued nevertheless her pain is debilitating and precludes her from competitive work. (R. 49).

---

[4] Perhaps Dr. Cybulski is the doctor Ms. Mueller allegedly saw at Storger's Neurology clinic. The dates are consistent, but it is impossible to tell. ( *See* R. 419).

**1.**
**Ms. Mueller's Testimony**

At the hearing on November 10, 2009, Ms. Mueller testified that she wished to change her alleged onset date from January 1, 2007 to May 1, 2007. (R. 20). She indicated she had been working part-time, since November 7, 2007, caring for her father, and when he died, her mother. (R. 20). As part of her job, she washed dishes, prepared breakfast, swept the floor, and took her mother to doctors' appointments. (R 21). She only gets paid for three hours a day caring for her mother, but it sometimes takes her longer because she has to stop and rest frequently because of her back pain. (R. 29). She added she typically has to rest for ten to fifteen minutes at a time. (R. 29). After a few hours of working for her mom she is drained: "It feels like I've worked 16 hours instead of 3." (R. 32). Her family helps her with vacuuming and laundry. (R. 29-30).

At her last job, as a courier,[5] she routinely lifted reams of paper weighing 40 to 50 pounds. (R. 23). Prior to that she worked in a disability facility until, "[o]ne of the people that I was working with accused me of talking really bad to her and they let me go." (R. 23). Prior to that she worked as a nursing assistant until she needed an operation to repair a hernia resulting from lifting heavy patients. (R. 24).

Ms. Mueller testified the primary reason she could not work was because of severe and debilitating pain in her back and hips. (R. 24). She explained that getting up and sitting down is difficult. (R. 24). She complained of dizziness and that she loses her balance a lot. (R. 24). Twisting slightly to the left or right causes her pain. (R. 24). She has trouble with her asthma as well as high blood pressure, which she believed was difficult to control because of her pain. (R. 25).

---

[5] The VE testified this occupation was more accurately described as a delivery driver. (R. 39).

Ms. Mueller stated her pain gets unbearable when she's standing and she has to sit and rest: "I feel like I'm going to throw up, so I have to sit or rest until that feeling goes away." (R. 43, 44). Prompted by her attorney, she claimed the pain affects her thinking, because she gets nauseated and "extra severely dizzy." (R. 44).

Ms. Mueller testified that she could sit for maybe ten minutes without fidgeting before she would have to get up or else she would "lock in that position" making it even harder to get up. (R. 26). While her pain does not inhibit her while sitting, she loses focus or concentration because she is "thinking about her pain," and the thought of getting up is "very depressing." (R. 45). Similarly, Ms. Mueller claimed that if she lays in bed for ten minutes she locks in that position, requiring her to wiggle to loosen herself up enough to move. (R. 26).

Additionally, Ms. Mueller testified that she had to put her feet up or they will start swelling. (R. 26). She answered affirmatively when her attorney asked her if her doctor told her to do so. (R. 32). When asked if her feet were swollen all of the time, Ms. Mueller answered that her feet swelled only if she kept them down too long. (R. 26). She later clarified that "too long would be maybe more than a couple of hours." (R. 31). After the vocational expert's testimony, she claimed that she always puts her feet up at waist level. Again, this is what some doctor told her to do. (R. 44).

Ms. Mueller testified that although she only brought a cane to the hearing she also used a walker. (R. 25). When questioned by the ALJ whether there were times when she didn't need either she responded that there were not. (R. 25). When she gets up out of a seat, she needs something to hold on to for a minute to gain her balance. (R. 26, 31). Although pain had always been there, she didn't need a cane to help her walk until she began working as a courier in 2005, and that over the course of the job, she lifted too many things, which aggravated her condition.

13

(R. 25). She claimed she could walk about two blocks without a walker, but she would need a cane to walk more than one. (R. 25). When asked how much she could lift, she said she tried not to go over 10 pounds. (R. 25). She was able to climb a flight or two of stairs but had to do it slowly, starting and stopping. (R. 27). She could stand in one spot for ten minutes leaning against a wall. (R. 27).

Despite these limitations, Ms. Mueller drives a car and is able to go to the store by herself. (R. 28). She testified she is active in the church, and that she works with the Sisterhood and Sunday school departments, occasionally teaching little kids. (R. 28). When Ms. Mueller was asked how she spent her spare time during the day, she replied that she was usually sitting or lying down. (R. 28).

Ms. Mueller testified she's currently taking "water pills" and nifedipine for her blood pressure, albuterol for her asthma, and piroxicam and "meloxin[6]" [sic] to reduce the swelling in her back. (R. 27). She also takes ibuprofen, Tylenol and low-dose aspirin at times. (R. 27). She testified her medications cause her various side effects. The water pills cause her to be dizzy when she stands. The nifedipine also causes her dizziness in addition to dry mouth. The albuterol makes her heart race and the piroxicam and "melx" [sic] make her heart "palpitate." (R. 27).

Ms. Mueller indicated that she was currently under the care of "Dr. Able Cole" and "Dr. Watsay." (R. 28)[7]. Ms. Mueller responded affirmatively when asked by her attorney whether a laminectomy had been recommended. She calls a surgeon on a regular basis to find out where she is on the list, but the office just tells her to call again the following month. (R. 33). She added that she also went to Northwestern to see a back specialist, who did not recommend

---

[6] Presumably meloxicam, allegedly prescribed by Dr. Kho, which is a prescription anti-inflammatory in the same class of drugs as piroxicam. (*See* R. 254); n.8.

[7] No medical records from either physician were provided.

14

surgery.  Instead,  he encouraged her to lose weight and try exercising to strengthen her back. (R. 33). Ms. Mueller concluded that while she was still waiting for the surgery, she wanted to exercise and do therapy, but she is in too much pain to exercise, nor is she able to pay for it. (R. 34).

### 2.
### The Vocational Expert's Testimony

The vocational expert ("VE"), Mr. Dunlevy, testified that as a CNA, Ms. Mueller was doing heavy, semiskilled work despite the Dictionary of Occupational Titles ("DOT") listing of medium. (R. 38).  Her work as a training specialist for people with developmental disabilities was heavy, semiskilled. (R. 38). As a home health assistant to her mother she was doing light, unskilled work. (R. 39). Finally, he classified her work as a delivery/van driver as being performed at the medium level of exertion, SVP 3, semi-skilled, which he testified was consistent with the DOT. (R. 39).

In response to the ALJ's first hypothetical, he testified that a person limited to light or sedentary work, subject to postural limitations of occasional kneeling, stooping, crouching, crawling or climbing, that person would not be able to return to any of Ms. Mueller's past work. (R. 39). Nor would there be any transferable skills. (R. 40). However, the VE testified that in  the Chicago metropolitan area there were available jobs such a person could be expected to perform. Examples were: laundry folders as found in nursing homes and hospitals (3,000 positions); inspector packagers as in the DOT that do simple visual inspection and very light packaging (7,000 positions); and some assemblers (at least 15,000 positions). (R. 40).

Responding to the ALJ's second hypothetical, the VE testified that a person who needed a hand-held assistive device for ambulation would be precluded from the position of laundry

folder, because those jobs require some ambulation. (R. 40). The positions of packagers and assemblers would not be affected by such a limitation because they do not require ambulation as part of their routine. (R. 40).

For his third hypothetical, the ALJ further limited the hypothetical person to only sedentary work. The VE indicated there would still be occupations within the framework he had established. (R. 40). Examples were: assemblers of smaller objects who are primarily seated (4,000 positions), such as the DOT example of compact assembler; visual inspectors (3,000 positions), such as those who do simple visual inspection of printed circuits or plastic items; and cashiers at sedentary (3,000 positions), such as those found at theater ticket booths and parking lots. (R. 40-41). The VE noted the last example, the cashier, was a variance from the DOT which classifies cashiers at the light level. (R. 40). He explained that he cited them at sedentary and listed three-thousand positions based on his extensive observations of these jobs in the context he described and that such a classification is a substrata of the cashiers II in the DOT. (R. 41).

For his final hypothetical, the ALJ asked the VE to fully credit the testimony of Ms. Mueller and accept her allegations as an accurate description of a hypothetical person's capabilities and limitations. The VE responded that a person who could stand no more than ten minutes, had some dizziness on standing, and required some foot elevation would still be able to perform the sedentary jobs he had just listed, with the exception that elevating of feet would require a footstool and consequently would limit jobs to those performed at table height – as opposed to workbench height – reducing the number of available positions by approximately twenty-five percent. (R. 42).

However, the VE indicated he didn't understand what Ms. Mueller had meant by her testimony that she had to rest for ten to fifteen minutes after some activity and so couldn't factor

that limitation into the ALJ's last hypothetical. (R. 41- 42). Her attorney attempted to clarify the issue through additional questioning of Ms. Mueller. (R. 42). After Mr. Mueller's additional testimony, her attorney asked whether a person who had to get up and move around every fifteen to twenty minuets, during which time they would not be performing work for a couple of minutes, would be able to work. (R. 47). The VE responded that if such breaks were no more than about six minutes total an hour, which would be about ten percent off task, then it would not be a problem. (R. 47). However, anything more than ten percent off task would present a problem for the production jobs he cited (R. 47). And, over fifteen percent off task would not be acceptable for the cashier positions he cited. (R. 47).

Ms. Mueller's attorney then asked whether, if in addition to those breaks, a person was off task due to their pain affecting their ability to concentrate, they would be able to sustain employment. (R. 47). The VE testified, that in his view, the reason why they were off task was irrelevant, what mattered was if a person could stay on task eighty-five to ninety percent of the day. Ms. Mueller's attorney then asked, if "they were off task 20 percent of the day, they would not be able to sustain employment?" (R. 47). The VE – predictably – responded if it was on a regular and sustained basis, then yes. (R. 48). Her attorney asked, what would happen if an individual had to elevate their legs at *waist* level. The VE indicated it would exceed what is allowed and preclude employment. (R. 48). Next, her attorney asked what would be the impact if an individual needed a walker for balance *and* ambulation. (R. 48). The VE responded that because of tight quarters and storage issues, it would, in most cases, preclude cashier and assembly work. (R. 48). Additionally she asked how an individual's absence twice a month would affect their ability to work. The VE answered it would preclude competitive employment if it were on a regular and sustained basis. (R. 48-49). Finally Ms. Mueller asked whether the

17

DOT recognizes a sit/stand option, which the VE indicated it does not. (R. 49).

## III.
## THE ALJ'S DECISION

The ALJ found that Ms. Mueller has not been engaged in substantial gainful activity since May 1, 2007, the amended alleged onset date of her disability. (R. 60). He found that she had the following impairments that at least in *combination*, were severe: lumbar degenerative disc disease, asthma, hypertension, obesity, and high cholesterol. (R. 60). However, none of her impairments met or medically equaled a listed impairment. *See* 20 C.F.R. §§404.1520(d), 404.1525, 404.1526. He referenced Listing 1.04 covering disorders of the spine noting there was no objective evidence of any impingement of the root or spinal cord and Listing 3.03 covering asthma noting the evidence did not document frequent exacerbations requiring emergency room visits or hospitalizations. (R. 61). Similarly, her hypertension did not meet or medically equal the criteria of any impairment in the Listing of Impairments because there was no evidence of end organ damage. (R. 61); s*ee* Listing 4.00(H)(1). In making his determination, the ALJ stated, "consideration was also given to her morbid obesity which can aggravate the symptoms and limitations from other impairments." (R. 61).

The ALJ began his RFC assessment by indicating he considered Ms. Mueller's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence, and other evidence. He also indicated he considered opinion evidence.

The ALJ first summarized Ms. Mueller's testimony beginning with her vocational experience. He then listed her allegations: severe pain in her back and hip, asthma, arthritis,

18

dizziness with loss of balance, pain on twisting, and hypertension. (R. 62). He discussed her alleged functional limitations: she can stand 10 minutes leaning on a wall, her walking is limited to 1 block without a cane and two with one; she climbed two flights of stairs slowly;  she can lift no more than 10 pounds; her feet swell if they are down too long; and that she has been walking with a cane since 2008. (R. 62). Finally he listed her medications: water pills, acetaminophen, blood pressure medication, albuterol for her asthma, lorazepam for swelling in her back, and over the counter analgesics. (R. 62). He noted her medications cause dizziness if she is standing as well as heart palpitations. He stated that although her "medically determined impairments could be reasonably expected to cause her alleged symptoms… her statements concerning the intensity, persistence, and limiting effects of the symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 62).

Having laid out Ms. Mueller's alleged impairments, the ALJ then discussed the impairments documented and observed by Dr. Villanueva during his CE in early 2008. The ALJ began by noting that Dr. Villanueva reviewed Ms. Mueller's medical history, took a history of her complaints directly from her, and physically examined her. The ALJ noted that she told Dr. Villanueva she was in a car crash in 1979 and began experiencing radiating pain in her lower back in 1987. He noted she told Dr. Villanueva walking *three* blocks or climbing a flight of stairs increased the pain. He also took specific note of Dr. Villanueva's observation that while she walked with a slow gait, *she did not use an assistive device*. He took into consideration Dr. Villanueva's observation that she was unable to squat or heel/toe walk because of her back pain. Also considered was the fact her strength and dexterity in her upper extremities was full and normal. Finally he acknowledged Dr. Villanueva's diagnostic impression of *possible* arthritis in her lumbar area based on the doctor's examination of her MRI which showed *minimal* bulging of

19

the L4-5 and L5-S1 disks, *moderate* spinal stenosis at L4-5, and degenerative changes of the facets at L4-5.

The ALJ then discussed Dr. Patey's physical RFC assessment, which reflected the restricted range of light work the ALJ adopted in his decision. First, he noted that Dr. Patey cited the results of the CE. Next he discussed how Dr. Patey noted Ms. Mueller's hospital records showed only one admission for an asthma exacerbation and that subsequent treatment notes were unremarkable with respect to her asthma (R. 63). The ALJ took special notice of Dr. Patey's opinion that while Ms. Mueller's activities of daily living are consistent with her back limitations and diagnosis, some of her alleged limitations were excessive when compared to the objective findings. (R. 62-63).

Furthermore, in direct contradiction to her allegations and testimony, the ALJ pointed out that in a more recent medical record from October 8, 2008, Ms. Mueller reported walking more than a mile and, in that same document, indicated her last asthma episode was more than three years ago. (R. 63).

Finally, the ALJ adopted Dr. Patey's February 2008 RFC conclusion that Ms. Mueller's impairments did not meet or medically equal impairment in Appendix 1 and she was able to perform light work, as defined in 20 C.F.R. §§404.1567(b) and 416.967(b), subject to postural limitations against more than occasional kneeling, stooping, crouching, crawling, or climbing of ladders, ropes, scaffolds, ramps, or stairs. (R. 63). The ALJ explained that he was adopting this as expert evidence pursuant to SSR 96-6p since it was consistent with the medical and other evidence, including subsequent medical records and Ms. Mueller's testimony, to the extent he was crediting it. Moreover, as the ALJ correctly noted that, "*[t]here is no contrary opinion from any treating source*." (R. 63) (emphasis added).

20

The ALJ then found, based on the VE's testimony, that Ms. Mueller was unable to perform any past relevant work. Having determined she had the RFC to perform light work, the ALJ then noted her ability to perform all of the requirements at that level was impeded by additional limitations. (R. 64). In order to evaluate the impact of those limitations on the unskilled light occupational base, the ALJ discussed his questioning of the VE at the hearing.

He indicated the VE testified that an individual with Ms. Mueller's age, education, work experience, and RFC, would be able to perform the requirements of representative occupations in the Chicago Area such as laundry folder (3,000 jobs), packer inspector (7,000 jobs), and assembler (15,000 jobs). The ALJ noted that if a person needed a hand-held device to assist in ambulation, such as a walker, then the jobs of laundry folder would be precluded. (R. 64). He continued, reciting the VE's testimony that if an individual was limited to sedentary work there would still be positions available such as an assembler of small objects (4,000 jobs), visual inspector (3,000 jobs), and cashier (3,000 jobs) – working in a theater or parking lot. He noted that the VE clarified that although the DOT classifies cashiers as light work, the VE was assessing them as sedentary in his expert opinion. (R. 64).

Finally, having found that the VE's testimony was consistent with the information in the DOT, pursuant to SSR 00-4p, the ALJ ruled that the record was persuasive that Ms. Mueller's limitations did not compromise the "extensive occupational base otherwise available" to her and therefore, a finding of "not disabled" was appropriate. (R. 64).

# IV.
# DISCUSSION

## A.
## The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). In these cases, the standard of review is deferential, and the court may not make independent credibility determinations or reconsider facts and evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Connour v. Barnhart* 42 Fed.Appx. 823, 827 (7th Cir. 2002). Even if reasonable minds may differ as to whether the plaintiff is disabled, the court must affirm the ALJ's decision if it is supported by substantial evidence. *Books v. Chater*, 91 F.3d. 972, 978 (7th Cir. 1996). However, conclusions of law are not entitled to such deference, and, if the ALJ commits an error of law, the decision must be reversed. *Schmidt v. Astrue*, 496 F.3d 833,841 (7th Cir. 2007).

In his decision, the ALJ must "minimally articulate" the reasons for his ultimate conclusion by "building an accurate and logical bridge from [the] evidence to [the] conclusion." *Zurawski v. Halter,* 245 F.3d 881 (7th Cir. 2001); *Clifford*, 227 F.3d at 872. This is a "lax" standard. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The ALJ need not address every piece of evidence, but he cannot subjectively limit his discussion of the evidence to only that which supports his conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). All that is

required is that the ALJ "articulate at some minimum level his analysis of the evidence" so that the court can assess the validity of his findings and provide a meaningful review. *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988).

## B.
## The Five-Step Sequential Analysis

The term "disability" is defined in Section 423(d)(1) of the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); *Stanley v. Astrue*, 410 Fed. Appx. 974, 976 (7th Cir. 2011); *Liskowitz*, 559 F.3d at 739-40.

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is

not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

### 1.
### The ALJ's Credibility Determination

An ALJ must support his credibility finding with articulate reasoning based on evidence in the record. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)*; Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir.2003). In examining the credibility of the claimant, the ALJ must take a number of factors into account, including the objective medical evidence, descriptions of the symptoms, treatments used to assuage those symptoms, and the daily activities of the claimant. *Id; Simila,* 573 F.3d at 517; 20 C.F.R. § 404.1529(c) (2)-(4).

But an ALJ need not discuss every piece of evidence in the record, *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir.2009). Nor does the "logical bridge" requirement specify how much the ALJ must say – the very nature of the enterprise precludes quantification, and the staggering workload of ALJs dictates that their opinions are, of necessity, often succinct.[8] Rather, it merely recognizes the obligation of the ALJ "'to rationally articulate the grounds for... decision.'" *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

In fact, an ALJ's credibility assessment and ultimate determination need not be perfect. *Outlaw v. Astrue,* 412 Fed. Appx. 894, 899, 2011 WL 891803, at *5 (7th Cir.2011); *Simila,* 573 F.3d. at 517; *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir.2008)*,* 516 F.3d at 546. So long as

---

[8] http://www.ssa.gov/policy/docs/statcomps/supplement/2011/2f8-2f11.html.

they are not "patently wrong," *Jones v. Astrue,* 623 F.3d 1155, 1162 (7th Cir.2010), and the latter finds "some support" in the record, *Berger,* 516 F.3d at 546, an ALJ's credibility and eligibility determinations will not be disturbed, regardless of how a reviewing court might have viewed the matter were it *res integra*. Demonstrating that a credibility determination is patently wrong is a "high burden." *Turner v. Astrue,* 390 Fed.Appx. 581, 587 (7th Cir. 2010).

Thus, when determining the sufficiency of the ALJ's credibility determination, a reviewing court must give that determination "special deference," *Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir.2010); *Briscoe,* 425 F.3d at 354, because the ALJ, not a reviewing court, is in the best position to evaluate credibility, having had the opportunity to observe the claimant testifying. *Jones,* 623 F.3d at 1160; *Simila*, 573 F.3d at 517. *Compare Ashcraft v. Tennessee,* 322 U.S. 143, 171, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (Jackson, J., dissenting) ("A few minutes observation of the parties in the courtroom is more informing than reams of cold record.").

### a.
### The ALJ's Boilerplate Language

Ms. Mueller's first criticism of the ALJ's credibility determination that the "her statements concerning the intensity, persistence, and limiting effects of the symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" – is meaningless boilerplate and thus the credibility determination is invalid.

The Seventh Circuit, noting its frequent use by ALJs in their decisions, has repeatedly criticized this template as "unhelpful," *Shauger v. Astrue,* 2012 WL 992100, 4 (7th Cir. 2012), "opaque," *Bjornson v. Astrue,* 2012 WL 280736 at 4 (7th Cir. 2012), and "meaningless," *Parker v. Astrue,* 597 F.3d 920, 921–22 (7th Cir.2010), and explained that it backwardly "implies that

the ability to work is determined first and is then used to determine the claimant's credibility."
*Bjornson,* 2012 WL 280736 at 5. More importantly, it fails to indicate which statements are not credible and yields no clue to what weight the ALJ gave a claimant's testimony. *See Spiva v. Astrue,* 628 F.3d 346 (7th Cir. 2010); *Parker,* 597 F.3d 920. In short, this sort of boilerplate is inadequate, *by itself*, to support a credibility finding. *Richison v. Astrue,* 2012 WL 377674, 3 (7th Cir. 2012). Conversely, its use by itself does not make a credibility determination invalid. Not supporting a credibility determination with explanation and evidence from the record does. *See Punzio v. Astrue,* 630 F.3d 704, 709 (7th Cir.2011); *Parker,* 597 F.3d at 921-22.

If the ALJ's credibility finding was based solely on the formula to which the plaintiff rightly objects, a remand would be required. But as we shall see, *infra* at 26*, et. seq.*, that is not all there is, notwithstanding the plaintiff's brief's narrow view of the ALJ's decision and its inaccurate portrayal of the ALJ's assessment of the evidence.

## b.
### The "Pain Analysis"

Ms. Mueller further faults the ALJ's credibility determination by arguing that he did not provide a "pain analysis" (Pl.'s Mem. at 7) – a term the brief uses as if it were a term of art – and it is not entirely clear what she means by it. She is correct that a claimant's level of pain is one of several factors an ALJ must consider. *See Terry,* 580 F.3d at 477. As the plaintiff's brief states, "[i]f the Plaintiff's allegation of pain is found to not be supported by the objective medical evidence in the file and the Plaintiff indicates that pain is a significant factor of her inability to work, then the ALJ must obtain a detailed descriptions of Plaintiff's daily activities by directing specific inquiries about the pain and its effects to the Plaintiff." (Pl.s Mem. At 7)(citing *Zurawski* 245 F.3d at 887). Presumably, this is what she means by a "pain analysis."

Ms. Mueller's argument is that the ALJ did not consider her level of pain associated with her degenerative disc disease or the measures she took to ease her pain such as the use of a walker or cane, as well as pain medication such as Vicodin.[9] Similarly, she insists he ignored her limitations in activities of daily living. (Pl.'s Mem. at 8). Neither is true.

SSR 96-7p does recognize "the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," and sets forth several factors to consider in addition to the objective medical evidence "when assessing the credibility of an individual's statements." *See also*, 20 C.F.R. §§ 404.1529(c), 416.929(c). Notwithstanding Ms. Mueller's allegations to the contrary, (*See*, Pl.'s Mem. at 7-9), the ALJ does discuss these various factors at length in his decision.

The ALJ began his credibility analysis by reviewing Ms. Mueller's alleged symptoms and her testimony about her daily activities. He describes: her daily activities, such as caring for her mother, washing dishes, sweeping the floor, driving to the store, and going to church, (R. 61, 62); the location, duration, frequency, and intensity of her pain, such as "severe pain in her back and hips," (R. 62); factors that precipitate or aggravate her symptoms, such as "pain on twisting," her limitations walking or climbing stairs, (R.62); the type, dosage, effectiveness, and

---

[9]Although Ms. Mueller brings up Vicodin in her brief, it is not on either of the lists of medications she takes in the record. (R. 27, 254). What is more confusing is why she wasn't taking it when, in the past, not only did she take hydrocodone, but she consistently reported an eighty percent reduction in her pain which made a real difference in her life. (R. 333, 335-36). There is nothing in the record to indicate a treating physician telling her not to take it, nor is there a treatment note indicating a complaint of addiction, tolerance, or intolerable side-effects. The fact that Ms. Mueller is not participating in a treatment proven to provide *significant* relief of her pain, without any explanation, serves to further undermine her credibility. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment). However, since the ALJ does not discuss it in his decision, the *Chenery* doctrine precludes its consideration in upholding the ALJ's decision. *See, Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947).

side effects of her medication, such as Lorazepam and over-the-counter-analgesics like Tylenol for her pain, and that her blood pressure medication makes her dizzy when she stands and her feet swell, (R. 62); her use of a walker, the need to elevate her legs, having to sit after ten minutes, and her claimed unsuccessful attempts to get surgery for her back. (R. 62).

The ALJ considered her pain. He just didn't believe that it was as debilitating as she claimed. Nor was he required to take her claims at face value. Social Security hearings are not exempt from the basic axiom of experience that parties and witnesses will exaggerate when it is to their advantage. *Schmude v. Tricam Industries, Inc.,* 556 F.3d 624, 628 (7th Cir.2009); *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir.2006); *Brown v. Chater,* 87 F.3d 963, 965–66 (8th Cir.1996). Exaggerated claims of pain and incapacity are not uncommon in cases such as this. *See Lopez v. Astrue,* 807 F.Supp.2d 750, 759-760 (N.D.Ill. 2011). Thus, the "administrative law judge did not have to believe [Ms. Mueller's testimony]." *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). Her subjective complaints were not required to be accepted insofar as they clashed with other, objective medical evidence in the record. *Arnold v. Barnhart,* 473 F.3d 816, 823 (7th Cir. 2007). "[D]iscrepancies between the objective evidence and self-reports may suggest symptom exaggeration. *Jones*, 623 F.3d at 1161; *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005).

Immediately after the ALJ's conclusion that the plaintiff's testimony was exaggerated, he devoted almost a full page of discussion explaining and supporting the conclusion with a meticulous review of the medical evidence in the case. Set forth below is that review:

> "In terms of alleged impairments, Dr. Villanueva performed a consultative examination of the claimant for the Disability Determination Services (DDS) on January 21, 2008 (Exhibit 5F). Dr. Villanueva reviewed the objective evidence, took a history of complaints from the claimant, and phyicallt [sic] examined her.

The claimant reported that she was hit by a car in 1979 and in 1987 began experiencing pain her lower back, radiating to the buttocks and at times the legs. She stated that walking 3 blocks or climbing a flight of stairs increased the pain. Dr. Villanueva observed the claimant walked with a slow gait but did not use an assistive device. She was unable to squat or heel or toe walk due to back pain. Her straight leg raising test was positive on the right. Her strength and dexterity in the upper extremities was full and normal. Dr. Villanueva's impression was possible arthritis in the lumbar area, noting that an MRI of the lumbar spine on October 25, 2007 showed minimal bulging of the L4-5 and L5-S1 disks, moderate spinal stenosis at L4-5, and degenerative changes of the facets at L4-5. (Exhibit 3F/4).

Dr. Patey prepared a physical residual functional capacity assessment of the claimant on February 8, 2008 (Exhibit 6F) reflecting the restricted range of light work adopted her. Dr. Patey cited the results of the consultive examination by Dr. Villanueva. Regarding claimant's asthma, Dr. Patey noted hospital records that showed admission for asthma exacerbation on August 18, 2006 followed by a discharge on August 20, 2006 after treatment with prednisone and nebulizers (Exhibit 1F/6 &7) but also treatment notes on October 12, 2007 that were unremarkable as to her asthma (Exhibit 7F/16). He opined that claimant's activities of daily living are consistent with her back limitations and diagnosis, but some of her alleged limitations were excessive when compared to the objective findings.

The record also includes a report of are-operation evaluation for a laparoscopic cholecystectomy on October 8, 2008 where the claimant reported walking more than a mile (Exhibit 10F/12) and a last episode of asthma more than 3 years ago.

Reviewing DDS physicians concluded on February 8, 2008 that the claimant's impairments did not meet or medically equal an impairment in Appendix 1 and allowed light work (i.e., lifting up 20 pounds occasionally and 10 pounds frequently; standing and/or walking and/or sitting for a total of six hours in a normal 8 hour workday), subject to postural limitations against more than occasional kneeling, stooping, crouching, crawling or climbing of ladders, ropes, scaffolds, ramps or stairs (Exhibit 6F). This expert evidence under SSR 96-6p is adopted since consistent with the medical and other evidence, including subsequent treatment records and the testimony, to the extent it is being credited. There also is no contrary opinion from any treating source.

In sum, the above residual functional capacity assessment is supported by the objective evidence as well as claimant's activities, including her caring for parents."

(R. 62-63)(Emphasis supplied).

While an ALJ cannot ignore evidence that conflicts with his conclusion, *Briscoe*, 425 F.3d at 354, virtually every reference to the record by Ms. Mueller's brief cites to either her own testimony at the hearing, or self-reported symptoms contained in either an SSA form or treatment note. Her complaints, in and of themselves, do little to bolster her credibility and what little objective medical evidence she does refer to, such as her MRIs, only serves to undercut the severity of her own allegations. The MRI of her lower back only revealed *minimal* bulging and *moderate* spinal stenosis. (R. 343). The MRI of her hips reflected *minimal* degenerative changes and no evidence for aseptic necrosis of the femoral heads. (R. 342). Other than limitations noted by Dr. Villanueva, Ms. Mueller does not cite to anything in the record indicating she exhibited anything but relatively normal neurological findings, strength, reflexes, and sensation.[10] *See Schmidt*, 496 F.3d at 844. It was perfectly acceptable for the ALJ to assess whether her testimony was consistent with the medical evidence in terms of the level of pain she alleged. *Id*.

Finally, not only are Ms. Mueller's symptoms inconsistent with the medical record, but some of her allegations are directly contradicted by prior statements she made to treating physicians. SSR 96-7p, advises, perhaps obviously, that "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." Conversely, prior inconsistent statements to doctors' and others can signify the claimant is lying or exaggerating. For example, the ALJ noted that Ms. Mueller testified she can only walk one block without a cane, and requires a walker to walk two blocks,

---

[10]  In her brief Ms. Mueller does mention that she had a positive straight leg raising test, but she fails to elaborate as to its significance. ( *See* Pl.'s Mem. at 3).  While a positive straight leg raise test can be indicative of radiculopathy, she does not make that argument.  Nevertheless, the ALJ noted this observation.  (R. 62).

(R. 62; *see* 25); that she frequently walks over a mile, supposedly using a walker, (R. 63, citing R. 412); and that she can walk without an assistive device. (R. 62, citing R. 317). These statements are not merely inconsistent, but outright contradictory. The severity claimed of her asthma is similarly questionable given Ms. Mueller's own representation to a physician that her last episode was more than 3 years ago. (R. 63, citing R. 412). Ms. Mueller's brief does not even attempt to explain these inconsistent statements. Her silence is deafening. The ALJ assessed Ms. Mueller's credability and found it suspect.

## 2.
## The RFC Evaluation

Ms. Mueller's next major criticism with the ALJ's decision is that he improperly evaluated her RFC under SSR 96-8p. In support of this contention, she argues that the ALJ failed to take into consideration several limitations, namely her issues with sitting, standing, and walking; her limited ability to bend; her use of a walker or cane; her asthma; and her foot swelling.[11] However, Ms. Mueller is mistaken. The ALJ did address each one of these limitations. The problem Ms. Mueller faces is that the medical record contains scant objective evidence in support of the alleged severity of Ms. Mueller's self-reported symptoms and accompanying pain and discomfort.

Ms. Mueller first argues the ALJ failed to discuss the evidence of her problems with standing, walking, sitting, and lying down. Specifically she testified standing causes her extreme pain; she has problems with balance; she can't walk any significant distance without a walker; while she doesn't have pain sitting down, she "locks up" after ten minutes; if she lays down for

---

[11] Another one of her contentions is the ALJ did not account for her obesity in his RFC determination and is discussed *infra*.

more than ten minutes she locks up. Other than her own statements, (*See* R. 24-27, 203-04), that is the extent of her evidence. Not only does the ALJ reference all of these allegations, but he even asked the VE to credit all of these claims for the purpose of a hypothetical. (R. 41). The VE testified jobs, at the sedentary level, with some restrictions, would still be available to a hypothetical person who could stand for no more than ten minutes, had dizziness on standing, had to elevate their feet and had to periodically get up and shift/move around for a couple of minutes (resulting in them being ten to fifteen percent off-task). (R. 41-42, 46-48).

Ms. Mueller then argues the ALJ didn't account for her ability to bend, by suggesting that Dr. Patey's RFC determination is inconsistent with Dr. Villanueva's CE. Specifically, she points out that Dr. Villanueva observed she had a flexion of 50/90, but that Dr. Patey said she could "'stoop occasionally' meaning that she could bend at the waste for up to one third of an eight-hour day." (Pl.'s Mem. at 12). The full definition of occasionally as defined in SSR 83-10 and printed on the form used by Dr. Patey is, "'occasionally' means occurring from very little up to one-third of an 8-hour workday," and is cumulative, not continuous. (R. 322). More importantly, the form reads, "When… less than one-third for occasionally, fully describe and explain." (R. 324). Dr. Patey wrote in that section – which indicates all those limitations are for less than one-third of a workday – "Decreased [Range Of Movement] of [Lumbar Spine] with slow gait." (R. 324). Clearly, Dr. Patey accounted for Dr. Villanueva's observed limitations in his assessment.

Ms. Mueller then claims that the ALJ did not consider her use of a walker or cane. Again, nothing in the record, other than Ms. Mueller's allegations, evidences a need for a walker to ambulate. In fact, although a handful of treating sources note her use of a walker, there are no treatment notes where Ms. Mueller ever complains that she was having difficulty walking, issues

with her balance, or dizziness resulting from pain or prescribed medication.[12] The ALJ noted, that in 2008, she reported walking more than a mile. (R. 62, 412)**.** Contained in that same record, Ms. Mueller also reported *unlimited* exercise tolerance with a walker. (R.412). Furthermore, the ALJ's consideration of this limitation is necessarily contained in his decision, as it was one of the hypotheticals the ALJ asked the VE. (R. 40). The VE testified that even with the added limitation of a walker for ambulation, such a hypothetical person limited to light work, could *still* perform jobs such as visual package inspectors and some assemblers. (R. 40).

   Ms. Mueller then argues that since the ALJ found her asthma was a severe limitation, he should have addressed it in his RFC determination. To be clear, the ALJ never found her asthma to be a severe impairment by itself, rather, he found her impairments, which included asthma, to be severe in combination. (R. 60). Moreover, nothing in the record suggests that asthma is a frequent complaint of Ms. Mueller. According to her own testimony, the biggest problem her asthma seems to cause is her asthma medication makes her heart race when she uses it. (R. 27). More importantly, the ALJ explicitly addressed and discounted the severity of her asthma. He wrote, "Regarding claimant's asthma, Dr. Patey noted hospital records that showed admission for asthma exacerbation on August 18, 2006, followed by a discharge on August 20, 2006, after treatment with prednisone and nebulizers but also treatment notes on October 12, 2007 that were unremarkable to her asthma." (R. 62) (citations omitted). He also cites to a later medical record, "on October 8, 2008... the claimant reported… a last episode of asthma more than three years ago." (R. 63) (citations omitted). This medical report, that the ALJ cites to, also notes that Ms. Mueller *denied* having dyspnea on exertion or shortness of breath or heart palpitation and she

---

   [12] The only record that mentions a link between her use of a walker to her back issues, is the notation of her unsubstantiated allegation, discussed *supra*, of degenerative joint disease resulting from her car crash in 1979 and requiring a walker. (R. 415).

denied regular use of her inhaler. (R. 412).

Ms. Mueller continues that the ALJ ignored her complaint of foot swelling. Again, there is not a single medical record generated by a treating physician that indicates Ms. Mueller ever complained about her feet swelling. Similarly, despite her testimony to the contrary, there is not a single medical report indicating a doctor told her to elevate her feet, let alone that she needed to elevate them waist high. (See R. 32, 44). In fact, by my count, there are only four records that mention anything about swelling. One record notes minimal pitted edema, but that is the full extent of that physician's concern (R. 415). Two others explicitly note *no* edema in her extremities. (R. 268, 329). The last record, which the ALJ cites to in discussing her ability to ambulate and her asthma, contains the notation that Ms. Mueller denied having "pedal edema." (R. 412).

Finally, the ALJ did implicitly consider the effect having to keep one's feet up would have on employment prospects when he asked the VE to consider a hypothetical person who needed to put their feet up. The VE indicated that at the sedentary level of excretion, such a limitation would exclude approximately twenty-five percent of the jobs he had listed at that level positions. If a person had to elevate their feet to waist level or above, then it would preclude all jobs. (R. 48).

Finally, the ALJ explained how he reached his RFC determination. Under SSR 96-6p findings of fact made by State agency medical consultants and other program physicians regarding the nature and severity of an individual's impairment *must* be treated as expert opinion evidence of non-examining sources by an ALJ. Additionally, SSR 96-6p mandates that an ALJ cannot ignore such an opinion and must explain the weight he gives the opinion. Here, the ALJ

explained that he adopted Dr. Patey's RFC, having found it consistent with the medical and other evidence, including subsequent treatment records, and even Ms. Mueller's testimony, "to the extent he credited it." (R. 63). Moreover, as the ALJ himself explained, there is *no* contrary opinion from *any* treating source. (R. 63).

The ALJ explained how he reached his RFC determination discussing which medical evidence he was relying on, and how it failed to support Ms. Mueller's allegations.

### 3.
### Obesity

Ms. Mueller further criticizes the ALJ for improperly evaluating her obesity. Specifically she argues that he somehow erred in considering her obesity at Step Three, he failed to consider her obesity in combination with her other impairments, and he failed to explain how obesity impacted her RFC.

Ms. Mueller argues that the ALJ didn't take her obesity into account at Step three when determining whether her impairments met or medically equaled a listed impairment. (Pl.'s Mem, at 60). SSR 02–1p states that obesity should be considered in determining whether the plaintiff's impairment meets or equals the requirements listed in the Commissioner's regulations. SSR 02-1p provides that obesity, by itself, can be medically equivalent to a listed impairment and gives the example that if someone is so obese they cannot ambulate effectively, as defined in Listing 1.02(B)(2), then their obesity can substitute for a major dysfunction of a joint under Listing 1.02, and a finding of medical equivalence can be made. Ms. Mueller's brief proceeds to list examples of her inability to ambulate effectively. (*See* Pl.'s Mem. at 15).

Putting aside the rather critical fact, as noted *supra,* that there are glaring and disturbing inconsistencies between the supposed severity of her alleged limitations and the medical record, at no point does Ms. Mueller articulate how her obesity affected her symptoms. *See Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006)(claimant did not specify how obesity further impaired her ability to work and pointed to no evidence in the record that demonstrated it did). Her medical record has several instances where a treating physician noted the fact she was obese, but these observations are without any further comment – an omission that is not likely to have occurred if the doctors thought the obesity affected or exacerbated a medical issue.

The only possible link between one of her symptoms, back pain, and her weight in the record is Ms. Mueller's hearsay testimony that a doctor at Northwestern Hospital suggested she try to lose weight *and* strengthen her back before considering a surgical option – the obvious and common sense inference being, maybe if she lost weight her back wouldn't hurt. (R. 33). More importantly, during her testimony at the hearing, she repeatedly stated that her difficulty ambulating was the result of pain and problems with her balance; her weight is never mentioned. (*See, e.g.*, R. 25, 31). Even in her brief, she stops just short of making the link between obesity and her symptoms. Instead, she tries to insinuate such, by first pointing out that, generally, obesity can cause problems with ambulation and then stating she has problems with ambulation. But that is obviously not enough.

Ms. Mueller also contends that the ALJ failed to consider her obesity in combination with her other impairments. (Pl.'s Mem. at 16). However, in step-two, the ALJ stated, "[t]he claimant has impairments that at least in combination are severe: lumbar degenerative disc disease, asthma, hypertension, obesity, and high cholesterol. (R. 60).  He continues, "[t]he claimant's impairments combine to cause more than minimal limitation in her ability to engage

36

in work activity." At step three, the ALJ explicitly found, that Ms. Mueller is "morbidly obese" and that, "[i]n assessing limitations from claimant's various impairments, consideration was also given to her morbid obesity which can aggravate the symptoms and limitations from other impairments." (R. 60-61).

Finally, Ms. Mueller alleges that the ALJ did not explain how obesity impacted her RFC. The question is not whether Ms. Mueller is obese; it is whether her weight limits her ability to perform light work. Obesity is a condition that should not be confused with a disability. *Gentle v. Barnhart,* 430 F.3d 865, 868 (7th Cir. 2006). As discussed, *supra,* M*s.* Mueller's medical records are devoid of even a suggestion that her weight had an adverse effect on her ability to work or so aggravated her other impairments as to render them disabling.

Ms. Mueller takes specific exception to the ALJ's reliance on Dr. Patey's physical RFC assessment because the report does not mention her obesity. (Pl.'s Mem. at p. 17). She argues that because Dr. Patey doesn't address her obesity, the ALJ cannot reasonably rely on Dr. Patey's opinion. However, Dr. Patey presumably considered her obesity as evidenced by his reference to various medical reports that make note of her obesity. (R. 329). Moreover, his failure to mention it is entirely consistent with the medical record's dearth of concern over her obesity. *See Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir.2004)(ALJ did not err in omitting mention of applicant's obesity where it was presumably factored into doctors' reports and applicant did not explain how it "further impaired his ability to work."). Here, the ALJ explained that he adopted Dr. Patey's opinion, having found it consistent with the medical and other evidence and because there is *no* contrary opinion from *any* treating source. (R. 63).

There is no indication that the ALJ failed to give sufficient consideration to whatever adverse effects plaintiff's obesity might have on her other impairments and her capacity for work; indeed, he went beyond what is required. Even where an ALJ does not address the impact of obesity, it is harmless error when the ALJ, as was done here, relies on the record for his RFC finding, *Prochaska,* 454 F.3d at 736-38; *Skarbek at* 504, especially when a claimant fails to specify how her obesity further impaired her ability to work. *Skarbek,* 390 F.3d at 504.

## 4.
## Conflict with the DOT

Ms. Mueller's final argument is that the ALJ erred in relying on the VE's testimony. SSR 00-4p places an affirmative duty on an ALJ to ensure that the VE's testimony is consistent with the DOT. *See also, Prochaska,* 454 F.3d at 735. This duty is two-fold. First, the ALJ must ask if the VE's testimony conflicts with the DOT. *Terry,* 580 F.3d at 478; *Prochaska,* 454 F.3d at 735. Then, if there if there is an "apparent conflict," the ALJ must obtain "a reasonable explanation for the apparent conflict before he can rely on that evidence to support a decision on whether an individual is disabled" SSR 00-4p; *Terry,* 580 F.3d at 478; *Prochaska,* 454 F.3d at 735. Ms. Mueller is correct that the ALJ did not ask the VE if his testimony conflicted with the DOT. (Pl.'s Mem. at 17). However, the error is harmless unless there actually was a conflict. *See Renfrow v. Astrue,* 496 F.3d 918, 921 (8th Cir.2007); *Ketelboeter v. Astrue,* 550 F.3d 620, 625-26 (7th Cir. 2008); *Keys v. Barnhart,* 347 F.3d 990, 994-95 (7th Cir.2003) (applying harmless error analysis to claim for disability benefits). Moreover, to the extent that there was a conflict, SSR 00-4p requires the ALJ to obtain an explanation only when the conflict between the DOT and the VE's testimony is "apparent." *Terry,* 580 F.3d at 478. Because Ms. Mueller did not identify any conflict at the hearing, she must now show that the conflict was "obvious enough

that the ALJ should have picked up on [it] without any assistance." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008). She mistakenly insists all she has to do is demonstrate an inconsistency between the VE's testimony and the DOT. (Pl.'s Mem at 18). However, not once does she suggest any of the alleged inconsistencies should have been obvious to the ALJ.

Ms. Mueller first supposed inconsistency relates to jobs cited to by the VE, and their corresponding DOT definitions. Citing to DOT #920-587.018 she argues that the position of "packager inspector" is listed in the DOT as a medium level position, which conflicts with the VE's testimony that this is a light position. (Pl.'s Mem. at 18). However, there are multiple DOT definitions that involve inspecting packages. The one Ms. Mueller cites to and implies is the only one, entitled "Packager, Handler," is at the medium level of exertion. However, a quick skim through the DOT reveals multiple other positions which are explicitly titled as an inspector such as 559.687-074, "Inspector and Hand Packer" and 920.387-010, "Inspector, Packaging Materials." Both of these listings are unskilled light work and consistent with the VE's testimony.

What the VE actually said, was, "There would be some packagers. There are inspector packagers in the DOT where they do simple visual inspection, very light packaging and there's at least 7,000 such jobs." (R. 40). The VE clearly asserted to the ALJ the positions he was suggesting were contained within, and thereby consistent with, the DOT. In fact, later in his testimony when there was an inconsistency, the VE himself brought it to the ALJ's attention:

> "I might add, Your Honor, that this is a variance from the DOT for the cashiers. The cashiers are listed at light. I cite them at sedentary in the numbers I have based on extensive observation of these jobs in the context that I have cited."(R. 41).

While the VE never listed the DOT numbers for any positions, SSR 00-4p does not demand any citation to code numbers. If Ms. Mueller had any confusion regarding the VE's testimony, she was represented by counsel and had ample opportunity to cross-examine the VE at the hearing and ask him to explain the job requirements in more detail or ask the ALJ to keep the record open so that she could cross-check the jobs he identified with the DOT. *See Stark v. Astrue*, 278 F.App'x 661, 667 (7th Cir. 2008) (citing *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008) (maintaining that VE's "bottom line" must be "available on demand")).

Even assuming there was an inconsistency with the package inspector description, Ms. Mueller has failed to provide any evidence, or even suggest that it was so obvious that the ALJ should have been aware of it. Additionally, the VE listed other available job positions besides package inspector; if the ALJ somehow erred in not following up, such error was harmless

Ms. Mueller's second alleged inconsistency is that the VE's testimony "potentially conflicts" with the DOT of definition of Light Work. (Pl.'s Mem. at 18-19). The VE testified that package inspector and assembler jobs, "are not jobs that require ambulation as part of the routine." (R. 40). She asserts in her brief that this description conflicts with the DOT's definition of "light work." Citing to the DOT and SSR 83-10, Ms. Mueller's brief reads, "[i]n the SSA regulations and in the DOT, light work requires walking or standing for a total of approximately 6 hours of an 8 hour workday." (Pl.'s Mem. At 18-19 ). However, SSR 83-10's definition of Light Work notes "[A] job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work. " Similarly, the DOT's definition provides that "a job should be rated Light Work... when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or ... when the job requires working at a production rate pace entailing the

40

constant pushing and/or pulling of materials even though the weight of those materials is negligible." To suggest that either definition requires someone to walk or stand and thereby precludes sitting is a misrepresentation. Furthermore, to be pedantic, even if Ms. Mueller's definition of Light Work was complete and precluded sitting, the VE said he was citing jobs that didn't require ambulation. Standing is not ambulation. There is nothing inconsistent between DOT's definition and the VE's testimony.

Finally, Ms. Mueller argues that the VE's testimony that if a person needed a hand-held device to assist in ambulation only the laundry folder job would be precluded, (R. 40), conflicts with his later testimony that if a person needed a walker for both balance and ambulation it would preclude most assembly work. (R. 48). The first question was in response to the ALJ adding a limitation of needing a hand-held device to assist in ambulation, while the second question, asked by Ms. Mueller's attorney, added a limitation of needing a hand-held device, such as a walker, for *both* balance and ambulation. There was no conflict for the ALJ to resolve between these two responses. Furthermore the second question, regarding balance and ambulation, was in the context of positions classified at the sedentary level of exertion, after the ALJ asked the VE to fully credit Ms. Mueller's testimony at the hearing.

Ms. Mueller has failed to articulate how any of these supposed inconsistencies are so obvious that the ALJ should have been aware of them. More importantly, they do not even appear to be inconsistent.

## V.
## CONCLUSION


The plaintiff's motion for remand is DENIED and the Commissioner's motion for summary judgment is GRANTED.


ENTERED:_____

UNITED STATES MAGISTRATE JUDGE

DATE: 5/16/12